We have a busy morning in front of us today. We have four cases scheduled for argument. Our first case is Palo Alto Networks v. Finjan, 17-2059.  May it please the Court, the Court should vacate the final written decision in this IPR because the Board failed to perform reasoned decision-making as required by the Administrative Procedure Act. Palo Alto Networks obtained cross-examination submissions from Finjan's two experts, Dr. Medvidovich and Dr. Binns, so impactful to patentability that Finjan moved to exclude the testimony of its own experts, calling it highly prejudicial. That's Appendix 497. The Board denied the motion to exclude, but then in its final written decision, without explanation, did not comment on any of Dr. Medvidovich's admissions and expressly stated that it did not rely on the Binns' cross-examination testimony. Wasn't that portion of Dr. Binns' testimony confined to secondary considerations of non-obviousness? It was directed to secondary considerations. And the Court didn't reach that, did it? No, Your Honor, it didn't. Why are you concerned that it did not comment on Dr. Binns' testimony? If it didn't reach those issues, why should we hold the Court to comment on those? Because Dr. Binns had prepared infringement time charts. That was the substance of his opinion testimony on secondary considerations. And in that infringement analysis, Dr. Binns was opining upon the scope of the claims. The issue is that patent claims can't, like a nose of wax, be treated one way for infringement and a different way for validity. And the reason that Binns' testimony was relevant here was that he was interpreting the patent claims for purposes of his secondary considerations infringement analysis in a way that was flatly inconsistent with the way that Dr. Medvidovich was interpreting the claims when he was reviewing them. Are you arguing that the Board is required to comment on every piece of evidence that's submitted? No, Your Honor, we're arguing that, as in the Princeton v. Vanguard v. Frito-Lay case, that reasoned decision-making requires the Board to do more than cherry-pick evidence that supports the conclusion it was meant to draw. That a substantial evidence review requires the examination of the record as a whole, taking into account both the evidence that justifies and detracts from the agency's decision. The Court in the Princeton v. Vanguard case said that the Board can't shortcut its consideration of the factual record before it. More recently, this Court in the last month decided the Altair Pharmaceuticals v. Paragon Biotech case. That was number 17-1487. In that case, the CEO of Altair, Mr. Alsawiyah, prepared two declarations that related to validity of the claim challenge there. The Board refused to consider the second declaration at all and gave no weight to the first declaration. This Court held that the PTAS decision to assign no weight to Mr. Alsawiyah's trial was self-discretion. Importantly, and I think relevantly to this case, held that an agency's refusal to consider evidence bearing on the issue before it is, by definition, arbitrary and capricious, and that the agency must take account of all the evidence of record, including that which detracts from the conclusion the agency ultimately reaches. The Board did not do that in this case. Now, I'd like to draw the Court's attention to one of the most glaring examples where the Board not only failed to consider the evidence that detracted from its decision, but also where the Board's finding wasn't supported by any evidence at all. The entire issue in this case turned on a claim limitation that requires dynamically building a parse tree. This is about malware detection. I'm going to interrupt you just to ask you one question. Do you see anything in the patent specification that talks about why it is that you want to dynamically build while receiving? Like what the advantages of doing that or anything that touts that as being important to the invention or anything? Your Honor, I can't cite to any discussion in the patent disclosure on that. The dynamically limitations, and there are two, are not discussed at any length in the patent disclosure or the claims. In fact, there's only one or two references at all to that issue. However, the cross-examination testimony of Dr. Medvedevich specifically addressed that question and as we've explained in our briefing, Dr. Medvedevich agreed that going back decades now in the field of malware detection, particularly when you're dealing with firewalls that are examining streams of data, it's of the utmost importance to attempt to analyze data in real time. And that goes directly to the question of dynamically building. What about the language that's referring to, for example, that the data stream is lexically analyzed again? And this reference to again several times in the prior, how do you respond to that? And why doesn't that provide substantial evidence to support the board's finding? The board's finding regarding lexical analysis is based upon the, and by the way, the board's finding, cites to appendix 3091, paragraph 73 and 74. That's the only evidence that the board cites in support of its finding that the entire data stream representing a file must be analyzed to determine the language the code is in. Appendix 3091, paragraph 73 to 74 is Dr. Medvedevich's declaration and the only thing that he says in that declaration is that the word again means that the stream is fully analyzed twice. And there's a citation to a dictionary definition. There's no technical analysis. There's no explanation. And he didn't speak in paragraph 73 or 74 to the issue of lexical analysis in terms  However, on cross-examination, because his opinions in paragraph 73 and 74 were totally untethered to the reality of the underlying technology, we asked questions of Dr. Medvedevich about the context of this invention, what was known in the art. And he agreed, and he provided testimony, and this is covered in appendix 438 and 439. We spent pages in our reply brief on this. He agreed that in the context of streaming data, the state of the art and understanding of the skill in the art was that streaming data travels over networks as packets and that all you need is a packet or a handful of packets to identify the programming language that a data stream is written in because we're talking about internet-based technologies and for example, there's an HTML tag or a script tag that will be contained in a single packet or a series of the first few packets in a data stream. And so the opinion that the board cites to, or I'm sorry, the testimony of paragraph 73 and 74 that the board cites to not only doesn't reach the issue, the only basis for Dr. Medvedevich's opinion there is pointing to the word again in the disclosure with no explanation why that would require complete analysis of an entire data stream in order to identify the language. Now again, the cross-examination testimony is consequential here because as explained in appendix 438, 439 and thereafter, also addressed in our blue brief at page 47, a single packet with an HTML tag is all that's necessary to identify the language so that you can apply the proper language rules to create your parse tree. Also at appendix 439, there's discussion and citation to the evidence where Dr. Medvedevich testified on cross-examination that a person with skill in the art would have been motivated to speed up malware detection, that the goal is to completely process the data stream as it passed. Those cross-examination admissions were completely contrary and contradictory to the board's finding that the entire data stream, the entire file has to be analyzed in order to determine the language that the code is written in. Now I'd like to turn back briefly to Dr. Bims's cross-examination admissions. Again, he was addressing that he had been offered to address secondary considerations, but in the context of providing an infringement opinion with supporting claim charts where he was comparing the language of the claims that were petitioned against a product offered by a company called WebSense. So in the context of those infringement positions, Dr. Bims was cross-examined and he testified and this is at appendix 2761, that a person of ordinary skill would understand the techniques such as detecting as well as analyzing parse tree nodes would take place as the program code is being downloaded. So he provided an opinion that a person of skill in the art would have understood that you would dynamically analyze and build a parse tree. This is the testimony that the board indicated in its final written decision that it was not relying upon. Again, although we recognize that the issue of secondary considerations wasn't reached by the board because of its finding, we still should not have a situation where the patent owners allowed to offer two different experts who offer completely contradictory testimony and then the board decides not to address the contradictory testimony of the second expert solely because it was on secondary considerations. This is as mentioned in the Amazon versus Barnes & Noble case, the nose of wax problem. The board cited to Chandani and said to the part, and this is at 103 column 7, the file to be scanned which may be stored and it goes on and says it does the storing before it's converted into a data stream. And why is that not substantial evidence that supports the board's finding? Because as addressed in our briefing, Chandani has two different embodiments. One is a file-based embodiment, one is a network-based embodiment. I believe you're referring to Appendix 1466 where Chandani explicitly discloses two embodiments, one virus detection on a data stream and another virus detection on a file. Even, Your Honor, in the case of the file, Chandani expressly states that its virus detection methodologies... But in that case, isn't the file first stored before it's converted? There are two embodiments. One embodiment, the file-based embodiment, does in some circumstances involve taking a file and turning it into a data stream, yes, but we were relying on the network-based embodiment, not on the file-based embodiment. But the citation I gave you speaks of a network. Information received via a network such as the internet or a wire or wireless transmission medium such as telephone landlines or RF airways is converted to a data stream. So the file is scanned and then stored before conversion to a data stream. Your Honor, I don't have the citation in front of me, but even Dr. Medvedevich agreed, and it is cited in our briefs, that the network-based embodiment was a separate embodiment from the file-based embodiment discussed in Chandani. In the network-based embodiment, the conversion of the file would happen at a server somewhere, not on the local computer. I'll reserve the rest of my time unless the court has any other questions. Okay, thank you. Mr. Andre. May it please the court. The board made factual findings as to the scope and content of the prior art. They made factual findings as to the difference between the art and the invention. They made factual findings as to the level of one's skill in the art and how one's skill in the art would view the art. That evidence that they cite to, the factual findings that they concluded, is substantial evidence. And that's what we're looking at. Is there substantial evidence to support the board's finding? That's what this appeal is about. There's nothing in Chandani, the primary reference that the appellant is relying on here, that would lead one to believe that they didn't do dynamic building of a parse tree. In fact, the board made factual findings that Chandani does do, actually file, restore the file before they do any type of scanning. Under both embodiments? Excuse me? Under both embodiments? There's actually only one single embodiment. What Chandani does in column 7 of the patent is it will take a file and create a data stream from the file after it's already stored. There's a single embodiment. There's not two embodiments. We disagree with my friend's characterization of that. And the reference that I cited, are you familiar with that? Yes. And does that go to a single embodiment? It does. And in fact, Judge Stoll talked about how Chandani talks about how it scans it again. And that's key. You can't scan it again if it's not already in storage. So there's nothing in Chandani that would lead one to believe that you could actually dynamically build the parse tree as a stream was coming in. My friend talked about the expert depositions and cross-examinations. I want to address that very quickly. Dr. Bims was put up for the secondary considerations issue. And Dr. Bims discussed a product from WebSense, an infringing product. And WebSense has since taken a license to these patents. And he was talking about one skill in the art at the time of infringement. He was not talking about one skill in the art at the time of the invention. Because he was looking at those skills of infringement at the time, which was very recently. We look at this after the teaching of the patents. He was not put in to talk about one skill in the art earlier. Because the secondary considerations, that wouldn't be relevant. As far as Dr. Medmedevich, he talked about, once again, a WebSense product, talking about the speed of it. And then he talked about some HTML tags, which had nothing to do with this at all. Just to be clear, you're not arguing that objective indicia that occurs or relates to after the patent has been filed, or after it's been issued, that it's not relevant? We're saying because the board didn't reach the issue of secondary considerations, it's not relevant here. If they would have reached secondary considerations, obviously it would have been. It's moot at this point. What they showed Dr. Bims was declarations regarding a product that was released years after the filing date or the priority date of these patents. And they're asking that one skill in the art, how would they look at it at that time period? At what time period? At the time period of infringement, not at filing. And he was talking about how one skill in the art would look at it at the time of infringement. Which is a very different equation, because you do that for secondary considerations. The board didn't consider the Bims because they didn't get to the secondary considerations, which is completely appropriate in this circumstance. And if you look at the actual testimony, both from, that was cited in the briefs, they don't support the appellant's position that Chandani teaches dynamic building on Park Street. It just doesn't do it. It's completely unrelated to that issue. So even if there was something to be said about the board not looking at the cross-examination, which they did, and if you look at what the board actually cited to, this goes back, it starts on page 18 of the appendix, and going in through page 26, they talk about the two different experts, appellant's expert and our expert. And they weigh those experts' testimony and what they have been provided. And they concluded that Dr. Medvedevich was more credible, his was more likely reading. The board is entitled, as this court has found in the Belden case, the board is entitled to rely on its own reading of prior art to find how skilled artisans would understand it. And in this case, that's exactly what the board did. I had asked a question earlier about the 408 patent and whether there was any disclosure in that patent of the dynamically building, the importance of that, is there anything that you can point to in the specification that talks about why it's desirable, for example, to have the dynamic building step occurring while the receiving step is occurring? Yeah, in the column one, in the background of the invention, it talks about how efficiency is important. They're identifying the problems. And then I think in column two, and again in column five, the patentee talks about how you can look at the day stream as it comes in. That's an important concept, because in theory, what you don't want to do is use unnecessary bandwidth. So if you can actually build the parse tree as the stream is coming in and be doing analysis at the same time, once you detect an exploit or malware, then you can cut it off right there. You can stop the process and stop it from coming into your system. I thought that the patent talked about efficiency generally, but do you have a specific site where it ties those concepts together? I don't have it at my fingertips. I'm sorry to say it wasn't raised in the briefing, so we didn't focus on that. But it does talk about generally the efficiency, and I think that's consistent with the briefing that was in the case. The dynamic building and then the next claim element, the dynamic detecting, is very important concepts for malware because you obviously want to do it efficiently, quickly, and before malware can get into your computer system. If you do that while it's dynamically building, you can cut off before the whole file is brought into the system. If you have no further questions, I think I've said all I need to say. Thank you. Sharman, you've got three minutes. In the court's review, I'd ask the court to pass its eye over the board's findings at Appendix 20 and 21 in which it states that Chonani requires multiple passes through the file, first to determine the appropriate script language, and then to lexically analyze the data stream to generate the stream of tokens. It's finding at Appendix 20 that it's not possible for the data stream to still be incoming when the data stream is lexically analyzed again. Both of those key findings in this case are based only upon Dr. Medvedevich's declaration testimony of paragraphs 73 and 74. There's no evidence in either one of those paragraphs other than his observation that the word again means the file has to be reviewed fully twice. That's not substantial evidence to support the board's findings and the board's failure to weigh the contrary evidence that violated the Administrative Procedure Act. I have nothing else unless the court has other questions. Any questions? No, sir. Thank you. We thank the party for the arguments.